# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT NASHVILLE
### June 18, 2013 Session

## STATE OF TENNESSEE v. MARTIN DEAN "CUB" MEEKS

**Appeal from the Circuit Court for Grundy County**
**No. 4560    Thomas W. Graham, Judge**

---

**No. M2012-02200-CCA-R3-CD - Filed August 1, 2013**

---

The defendant, Martin Dean "Cub" Meeks, was convicted by a Grundy County jury of first degree premeditated murder and sentenced to life imprisonment. He raises three issues on appeal: (1) whether the trial court failed to properly exercise its duty as thirteenth juror; (2) whether the evidence is sufficient to establish premeditation; and (3) whether the trial court erred by not instructing the jury on voluntary intoxication. Following our review, we affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

ALAN E. GLENN, J., delivered the opinion of the Court, in which NORMA MCGEE OGLE and D. KELLY THOMAS, JR., JJ., joined.

B. Jeffery Harmon, District Public Defender; Robert G. Morgan (on appeal), Philip A. Condra and Kandi M. Nunley (at trial), Assistant Public Defenders, for the appellant, Martin Dean "Cub" Meeks.

Robert E. Cooper, Jr., Attorney General and Reporter; Jeffrey D. Zentner, Assistant Attorney General; J. Michael Taylor, District Attorney General; and Steven H. Strain and David O. McGovern, Assistant District Attorneys General, for the appellee, State of Tennessee.

## OPINION

### FACTS

This case arises out of the June 14, 2009 shooting death of seventy-seven-year-old Carl Winton at the hands of the fifty-three-year-old defendant. The victim lived in a house trailer that was located on land in Grundy County that belonged to the defendant's mother. The defendant invited some of his friends to move their own house trailer to the same piece

of property, and approximately one month before the shooting, they started clearing an area near the victim's trailer in preparation for locating their trailer behind the victim's. On the day of the shooting, the victim returned home to find the defendant and his friends tending a trash fire near his trailer, which angered him and led to a heated verbal altercation between him and the defendant. At some point during the altercation, the defendant retrieved a shotgun from his mother's nearby home and returned to the scene, where he and the victim briefly resumed their argument before the defendant fired a shotgun slug into the victim's chest, killing him. In a statement to law enforcement, the defendant claimed that he shot the victim in self-defense because he saw him reaching inside his pants pocket for his own weapon.

At the defendant's August 2011 trial, Carolyn Conry, the victim's daughter, testified that the victim was a few weeks shy of his seventy-eighth birthday at the time he was killed. She said the victim had been good friends with the defendant's parents, and they had invited him to move his trailer onto their land approximately twenty-five to thirty years earlier. She stated that after the defendant's father died, the victim helped the defendant's mother in various ways, including mowing her yard, taking her to doctors' appointments, and running errands for her.

Chief Tommy Wiley of the Bell Buckle Police Department, who was the first officer to respond to the scene, testified that when he arrived Renee Brown flagged him down and informed him that there had been a shooting. He said he first checked on the victim, who was clearly dead, and then secured the crime scene.

Renee Brown Stephens, who said she had married Glen Stephens since the time of the shooting, testified that in June of 2009 she and Glen[1] were preparing to move their house trailer to the defendant's mother's property at the invitation of the defendant. On the afternoon of the shooting, she and Glen were at the site with Glen's son, Dustin, Kenneth Clay, Brian Meeks, and the defendant cleaning the area and burning down a dilapidated outbuilding when the victim began "raising a ruckus" about their actions. She said she heard the victim and the defendant arguing and at one point saw the defendant walking from the direction of his house toward the victim's trailer carrying a shotgun. The witness conceded that she told the sheriff in a statement immediately after the incident that she said "[p]lease don't" to the defendant as he walked past her with the shotgun. She claimed, however, that she currently had no memory of having said those words to the defendant. Instead, she recalled that it was the defendant who said, "Please don't" to the victim immediately before the shooting.

---

[1] Because several of the witnesses share the same last name, we will refer to them by their first names to avoid having to continually repeat their entire names. We intend no disrespect by such usage.

On cross-examination, the witness testified that she and Glen had been clearing the property for approximately a month before the shooting occurred and had already moved their horses onto the land. She said the defendant shot and killed a number of rattlesnakes and copperheads during their clearing of the property, and it was therefore not unusual for her to see him carrying a gun. She stated that she saw the victim each day they were working and that he was usually in a foul and "grouchy" mood. She testified that the victim regularly cursed at them and called them obscene names but that Glen told them to just ignore him, which is what they did.

The witness recalled that on the day of the shooting the victim complained to the defendant that they might as well "bring the F-ing fire to his house and burn his house too." She said she could not hear all the words that the defendant and the victim exchanged, and she did not witness the shooting but heard the gunshot. Afterwards, the defendant, who was visibly upset and crying, told everyone to leave. She remained behind with the defendant after everyone else left and called 911 at the defendant's request because he was too choked up to talk to the 911 operator. After the shooting, the defendant placed his gun and shotgun shells on the smoker and waited with her at the site for the arrival of the law enforcement officers.

Dr. Thomas Deering, the pathologist who performed the autopsy of the victim's body, testified that the victim died of a large shotgun wound to the center portion of his chest and that he recovered a fragmented shotgun slug from the victim's body. He said the victim's blood tested negative for the presence of alcohol or drugs.

Kenneth Clay, who said he had pled guilty to methamphetamine charges and was currently in federal custody, testified that he was drinking a beer and visiting with Brian Meeks when the victim pulled up to the property and began arguing with the defendant. He said that at some point, he saw the defendant walking from the direction of his mother's home toward the victim's trailer carrying a shotgun. Clay stated that he heard the defendant telling the victim to go back inside and to leave them alone and that it was his land and the victim could not tell him what to do with it. He then heard the victim yell to the defendant not to point his "fucking finger" at him, followed by the sound of a gunshot. Clay testified that he did not see the victim with a gun that day, but he did not have a clear view of him during the confrontation. Although he had a better line of sight to the defendant, he could not recall whether or not the defendant raised his shotgun before shooting.

On cross-examination, Clay testified that he had seen the victim with pistols in the past and had heard him joke about how he was too old to fight but could take care of someone with a pistol if necessary. He said both men were raising their voices in a heated argument before the shooting.

Director Kyle Brewer of the Twelfth Judicial District Drug Task Force, who was a criminal investigator with the Grundy County Sheriff's Department at the time of the shooting, testified that he transported a blood alcohol kit containing blood drawn from the defendant at 11:25 p.m. on the day of the shooting to the Tennessee Bureau of Investigation ("TBI") Laboratory for analysis. He said the first call to the sheriff's office came in shortly before 6:00 p.m. that day.

TBI Special Agent Forensic Scientist Dawn Sweeney, who performed the analysis of the defendant's blood, testified that his blood sample showed a blood alcohol level of .07%, which would have the effect of causing an increase in reaction time, drowsiness, and a decrease in critical judgment. She said that a person metabolizes alcohol at the rate of .01 to .02% per hour and that the defendant's blood alcohol level could have been .05 to .10% higher five hours before his blood was drawn, for a possible blood alcohol level of .12 to .17%. She further testified that the defendant's blood sample showed a level of Diazepam, or Valium, of less than .05%, and a level of Nordiazepam, which is a breakdown product of Diazepam, of .06%, both of which were within therapeutic levels. She stated that Diazepam, like alcohol, is a central nervous system depressant which can cause drowsiness, an increase in reaction time, and a decrease in critical thinking. She further testified that the two drugs could "potentiate," or "act on each other [to make] the effects of the drugs stronger."

TBI Special Agent Larry Davis identified various photographs of the crime scene, including ones that showed the victim's body lying on the ground with a burnt cigarette beside one hand and a cigarette lighter beside the other hand; a pistol that was found underneath the victim's body; a 20-gauge shotgun and five live rounds that were lying on top of a stainless steel smoker behind a building; and a spent shotgun shell that was found beside a corner of a shed. Agent Davis stated that he removed four live rounds from the shotgun and five live rounds from the pistol before submitting the firearms and ammunition to the TBI laboratory for analysis.

Agent Davis also identified a CD of the June 14, 2009 interview that he, Grundy County Sheriff Brent Myers, and Grundy County Criminal Investigator Kyle Brewer conducted with the defendant at the Grundy County Jail, which was admitted as an exhibit and played for the jury. In the interview, the defendant said that he and the victim had been engaged in a month-long dispute about his friends' plans to move to the property. He said that when the victim began cursing him and his friends on the afternoon of the shooting, he told the victim to take his trailer and belongings and move somewhere else. The victim continued cursing him and began threatening to kill everyone, so he left, retrieved his loaded shotgun from his home and some additional shells, returned, and told the victim again to gather his belongings and trailer and move off his property. The defendant stated that the victim cursed him again and put his hand down in his pocket as if reaching for his pistol, so

-4-

he shot the victim to avoid being shot by him. The transcript of the defendant's interview reads in pertinent part:

> [Defendant]: He started on me, cussing me again, I told him, I said, leave, just take your trailer and stuff and leave, he kept cussing me, he said something about he'd kill every damn one 'em and burn everything up there, something, I said fine, I went to the house and got my shot gun.
>
> [Agent] Davis: So you left at that time, when he said that, you left and went?
>
> [Defendant]: I went up there and got my gun, I come back, I walk up there building.
>
> . . . .
>
> [Agent] Davis: How far is home?
>
> [Defendant]: 100 yards, I guess across there.
>
> [Agent] Davis: O.k. you went up there and got your gun, did you get any shells?
>
> [Defendant]: It was loaded.
>
> [Agent] Davis: It was already loaded?
>
> [Defendant]: Yes, sir.
>
> [Agent] Davis: Did you get any shells and put in your pocket?
>
> [Defendant]: I had five.
>
> [Agent] Davis: Five, that was in there?
>
> [Defendant]: I had five in the gun, I had five in my pocket.
>
> [Agent] Davis: Five in your pocket, and you walked back, how did you get back?
>
> [Defendant]: Straight back this way, come from, right across the little lot there,

where the horses at.

. . . .

[Agent] Davis: And what did you do then?

[Defendant]: I just walked around in the shed and he was still standing there cussing me, I told him get your damn trailer and stuff and leave.

[Agent] Davis: How was he standing?

[Defendant]: Just stand[ing] straight in front [of] me, out there.

[Agent] Davis: Was he standing there at the lawn mower?

[Defendant]: Um, between the lawn mower and truck.

[Agent] Davis: Between the lawn mower and the truck, and he was standing straight up?

[Defendant]: Straight, looking straight at me.

[Agent] Davis: And what, what did he do?

[Defendant]: He started cussing me and I told him, get your trailer and stuff and leave! I said (inaudible) and leave, get your damn trailer and leave.

[Agent] Davis: Where did you have your shot gun?

[Defendant]: Had in this hand like this.

[Agent] Davis: O.k.

[Defendant]: And he run that hand down in that pocket, I know he carries a pistol, well I thought he was going to shoot me, so I shot him.

The defendant acknowledged that he was angry when he walked to his mother's home to retrieve his gun and explained that he got the weapon to be ready to defend himself if the victim tried to shoot him:

[Agent] Davis: Got your gun and got five more shells?

[Defendant]: Hum, huh.

[Agent] Davis: Well you think you was gonna to have a shoot out?

[Defendant]: I didn't know.

Sheriff: You said you was mad?

[Defendant]: Yeah.

. . . .

Sheriff: When you went and got your gun you was mad?

[Defendant]: Hum, huh.

Sheriff: Why was, why was you mad?

[Defendant]: A man standing on your own ground, your own home and call you every son-of-a-bitch [yo]u can think of, you get mad, won't you? [T]hat made me, I'm just human.

. . . .

Sheriff: That you went, I ain't trying to make you mad, I'm just trying to get to the bottom of this, you went and got your gun cause you was mad[?]

[Defendant]: Yeah he said he'd kill me.

Sheriff: What did you think you was gonna do when you got back with your gun?

[Defendant]: If he tried to shoot me, I'd sh[o]ot him.

The defendant reiterated that he shot the victim only after seeing the victim reach into his own pocket and believing that the victim was about to shoot him. He acknowledged, however, that he never saw the victim's pistol:

[Defendant]: He's still cussing me, his hand went in that pocket, when it went in that pocket, I said you['re] coming out with that old pistol, he was going to shoot me, so I shot him.

. . . .

[Agent] Davis: Did you ever see a gun in his hand?

[Defendant]: No, I didn't see it.

On cross-examination, Agent Davis acknowledged that the photograph of the victim's body showed that the victim's pistol was clearly outside his pocket, "right there at his hip[.]" On redirect examination, he testified that it was possible that the victim carried his weapon in his waistband or belt rather than in his pocket and that, from the photographs, it appeared that the victim had a cigarette in his right hand at the time he was shot.

TBI Special Agent Steve Scott, an expert in firearms identification, identified the shotgun as a 20-gauge Franchi-Brescia semi-automatic shotgun with a total capacity of five rounds, with one in the chamber and four in the magazine. He identified the pistol as a Taurus .38 special caliber five-shot revolver and testified that it was in working condition.

The State's last witness was Grundy County Sheriff Brent Myers, who testified that approximately two days before the victim's death, the victim called him out to his home to talk to him about problems he had been having with the defendant. Sheriff Myers said he participated in Agent Davis' June 14 interview with the defendant and on June 15 conducted a second, longer interview in which the defendant essentially repeated what he had said in the first interview. On cross-examination, he acknowledged that the defendant told him that the victim had threatened to kill him a week earlier and that their conflict had started when the defendant's friends moved their horses to the property. He further acknowledged that the defendant told him that he was very mad at the time he retrieved his gun, questioned him when he said the victim was killed by a slug, stating that he thought the weapon was loaded with triple aught buckshot, and told him that he never intended to kill the victim but instead only to confront him. Finally, he conceded that the defendant did not run or attempt to hide after the shooting.

The defendant's first witness, Dustin Stephens, testified that he was fifteen years old at the time of the shooting and was helping his father, Glen, and his father's fiancée, Renee Brown, clean the property in preparation for moving their trailer. He said he was shoveling out an old barn when he heard someone yelling, climbed into the barn loft, and looked out to see the defendant and the victim arguing. He stated that he heard the victim calling the

defendant an "SOB" and other names and the defendant telling the victim to stop yelling and that if he did not like what they were doing, he was welcome to take his stuff and leave. He said the victim was clearly angry, but the defendant, who was talking in a lower tone of voice, did not sound mad.

Dustin testified that the defendant was holding a shotgun but did not have the barrel pointed toward the victim and was not making any threatening gestures with it. He testified that the defendant asked the victim several times to please leave them alone and was gesturing with his hands toward the victim. The victim yelled at the defendant, "Don't be pointing any F-ing fingers at me" and then began "scrambling" in his pocket as if to reach for his gun. The defendant said, " No, Carly, please don't. Don't, Carly," and then "held his gun up and fired." On cross-examination, Dustin acknowledged that he never saw a gun in the victim's hand. He said he never heard the defendant raise his voice to the victim, although he did hear him speaking with a "crack in his voice," as if he were upset or disappointed.

Glen Stephens testified that he and his wife had several unpleasant encounters with the victim during the time they were working on the property, with the victim cursing at them and calling them names and telling them that he did not want them on the property. He said he did not know the victim well and therefore sought and received advice from his father-in-law about how to handle him. On the afternoon of June 14, the victim returned home and began "raising hell" about their burning of the outbuilding. The witness recalled that the victim told the defendant that he should just go ahead and make the fire bigger and burn his place too, and the defendant replied that if he did not like the fact that he was cleaning up his property, the victim could hook up his mobile home and leave.

The witness testified that he turned back to his work at that point and did not witness anything more until he heard the defendant and the victim shouting at each other. He was unable to hear everything that was said, but at one point in the altercation he saw the victim, who had been leaning against a lawnmower, stand up in an "aggressive posture" and begin digging in his pocket. The witness said the last thing he heard before the gunshot was the defendant saying, "Please, Carly, don't," which he repeated three times. He also said that he thought he saw the victim with a black object in his hand.

The witness testified that he described the black object he saw in the victim's hands during an interview at the sheriff's department. He said the sheriff told him that there was "absolutely no gun found on the scene" and that he told he sheriff that the object he saw "could have been a cigarette case for all [he] kn[e]w." Finally, he testified that the defendant brought his shotgun up and fired in "a single action" without shouldering the weapon.

James Northcutt, who said the victim was his half-uncle, testified that two days prior to the shooting he encountered the victim at a service station, where the victim asked if he had been by his home recently. He said the victim told him that they were cleaning up around his place and burning some buildings and that they thought they were going to run him off. The victim also said that he was "70 something years old," that he had nothing to live for, and that "they [were] going to be gathered together and [he was] going to shoot in the middle of them." Northcutt testified that after making that statement, the victim "gave a gesture." On cross-examination, Northcutt acknowledged that the victim asked him to talk to the defendant on his behalf to try to work something out. He further acknowledged that he failed to inform the sheriff or warn the defendant about the victim's threats.

The defendant testified that about a year before the shooting he moved in with his elderly mother, who was currently ninety-two and in poor health. He said he had known the defendant since he was a child and up until 2009 considered him a good friend. At some point that year, his friends, Renee Brown and Glen Stephens, asked permission to move their trailer to the property and, after getting his mother's consent, he told them they could do it. The defendant said that the first thing his friends did was repair the pasture fence and move their horses to the property. The victim made it clear to him that he did not like the horses being there, but he told the victim that the horses were not bothering the victim and that they would help the property by keeping the grass short.

Sometime later, he informed the victim that his friends were also going to move their house trailer to the property. The victim again expressed his displeasure, telling him that he did not want "that bunch of trash around him." The defendant said he told the victim that they were his friends and if the victim did not want to live near them, he could move. He stated that as he and his friends began working, mostly on the weekends, to clear a site for their trailer, the victim regularly cursed and yelled at them. The defendant stated that he "let it go," for over a month but when the victim started in again on the afternoon of June 14, he became very angry and engaged in a heated argument with him.

The defendant testified that he knew the victim had pistols, which he either carried on his person or kept nearby, so he left, walked to his house, picked up his shotgun and five shells, started to load the gun, found out that it was already loaded, put the five extra shells in his pocket, and walked back to the area carrying his gun in his right hand with his finger off the trigger and the barrel pointed toward the ground. The victim was standing next to a lawnmower and when he saw him with the gun, the victim said to him, " I'll kill you, damn you, Cub." The defendant stated that he replied, "Don't do it, Carly. Please, don't do it." He said the victim then went for his gun and he reacted by throwing his shotgun up and shooting the victim without taking time to aim.

The defendant testified that he could not recall all of the words that he and the victim exchanged during their argument and could not remember walking back from his house across the pasture because he was so angry at the time. He said that after he shot the victim, he laid his gun and shells on the smoker and had Renee call 911 because he was too upset to make the call himself. He did not check on the victim to see if he was still alive. On cross-examination, the defendant denied that he intended to kill the victim and said he shot him in self-defense. He said he "drank a few beer[s]" on the day of the shooting, but he did not think that either Renee or Glen had anything to drink.

## ANALYSIS

### I. Thirteenth Juror

The defendant first contends that the trial court failed to properly exercise its role as thirteenth juror, arguing that the court's "deferment to the jury verdict regarding premeditation contradicts [the court's] finding of passion and irritability in the Defendant at the time of the killing." Rule 33(d) of the Tennessee Rules of Criminal Procedure provides that a "trial court may grant a new trial following a verdict of guilty if it disagrees with the jury about the weight of the evidence." The rule imposes a mandatory duty on the trial judge to act as the thirteenth juror in every criminal case. See State v. Carter, 896 S.W.2d 119, 122 (Tenn. 1995). The rule requires that the trial judge be personally satisfied with the verdict, see State v. Dankworth, 919 S.W.2d 52, 56 (Tenn. Crim. App. 1995), and its purpose is "to be a 'safeguard . . . against a miscarriage of justice by the jury.'" State v. Price, 46 S.W.3d 785, 823 (Tenn. Crim. App. 2000) (quoting State v. Moats, 906 S.W.2d 431, 434 (Tenn. 1995)). The trial court does not have to make an explicit statement on the record. Moats, 906 S.W.2d at 434. Instead this court may presume by the trial court's overruling of the motion for new trial that it approved of the jury's verdict. Id. If, however, "the record contains statements by the trial judge expressing dissatisfaction or disagreement with the weight of the evidence or the jury's verdict, or statements indicating that the trial court absolved itself of its responsibility to act as the thirteenth juror[,]" the reviewing court may reverse the trial court's judgment. Carter, 896 S.W.2d at 122.

The defendant bases his contention that the trial court expressed its dissatisfaction with the jury's verdict of a premeditated killing on the following comments the trial court made while rejecting defense counsel's argument that the killing occurred in a state of passion brought on by adequate provocation:

> There's no question he was mad as hell, or he wouldn't have done what he did, right? Because there really is no showing that he was defending himself. It's a matter of acting out of being angry. So that anger has to be produced by

-11-

adequate provocation to sufficiently lead a reasonable person to act in that manner. The fact that someone is on your property squatting, and has been there for 100 years, and you're tired of seeing them there and want to get rid of them and they talk nasty to you, I don't think could be considered by any rational person as adequate provocation to produce the state of mind that the defendant found himself in. It just is not excusable to kill somebody because they make you mad as hell.

The trial court then went on to consider whether there was sufficient evidence to sustain the jury's finding of premeditation and concluded that there was:

Of course, premeditation requires reflection [and] judgment, but it can be done in a relatively short period of time, and I think . . . the jury understanding all that was going on and that the [defendant] left the scene of the controversy, went to his house, got a long rifle. Had he had a gun in his pocket, pulled it out and shot the guy, he might well have been able to argue and a jury might have agreed that that was just second degree murder, a knowing killing, but the walk to the house, the getting of the gun that he didn't already have in his possession, and even to some extent, the fact that he got extra ammunition is grounds that he was thinking exactly about what he was doing for several minutes[.]

In sum, the record does not show that the trial court disagreed with the jury's verdict or failed to exercise its duty as thirteenth juror. We, therefore, conclude that the defendant is not entitled to relief on the basis of this issue.

## II. Sufficiency of the Evidence

The defendant next contends that the evidence is insufficient to sustain his conviction for first degree murder because it fails to establish the element of premeditation. In considering this issue, we apply the rule that where sufficiency of the convicting evidence is challenged, the relevant question of the reviewing court is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979); see also Tenn. R. App. P. 13(e) ("Findings of guilt in criminal actions whether by the trial court or jury shall be set aside if the evidence is insufficient to support the findings by the trier of fact of guilt beyond a reasonable doubt."); State v. Evans, 838 S.W.2d 185, 190-92 (Tenn. 1992); State v. Anderson, 835 S.W.2d 600, 604 (Tenn. Crim. App. 1992).

All questions involving the credibility of witnesses, the weight and value to be given the evidence, and all factual issues are resolved by the trier of fact. See State v. Pappas, 754 S.W.2d 620, 623 (Tenn. Crim. App. 1987). "A guilty verdict by the jury, approved by the trial judge, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the theory of the State." State v. Grace, 493 S.W.2d 474, 476 (Tenn. 1973). Our supreme court stated the rationale for this rule:

This well-settled rule rests on a sound foundation. The trial judge and the jury see the witnesses face to face, hear their testimony and observe their demeanor on the stand. Thus the trial judge and jury are the primary instrumentality of justice to determine the weight and credibility to be given to the testimony of witnesses. In the trial forum alone is there human atmosphere and the totality of the evidence cannot be reproduced with a written record in this Court.

Bolin v. State, 219 Tenn. 4, 11, 405 S.W.2d 768, 771 (1966) (citing Carroll v. State, 212 Tenn. 464, 370 S.W.2d 523 (1963)).

"A jury conviction removes the presumption of innocence with which a defendant is initially cloaked and replaces it with one of guilt, so that on appeal a convicted defendant has the burden of demonstrating that the evidence is insufficient." State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982).

First degree murder is defined as "[a] premeditated and intentional killing of another." Tenn. Code Ann. § 39-13-202(a)(1) (2010). "Premeditation" is

an act done after the exercise of reflection and judgment. "Premeditation" means that the intent to kill must have been formed prior to the act itself. It is not necessary that the purpose to kill pre-exist in the mind of the accused for any definite period of time. The mental state of the accused at the time the accused allegedly decided to kill must be carefully considered in order to determine whether the accused was sufficiently free from excitement and passion as to be capable of premeditation.

Id. § 39-13-202(d).

The "element of premeditation is a question of fact" for the jury to determine based upon a consideration of all the evidence. State v. Suttles, 30 S.W.3d 252, 261 (Tenn. 2000) (citing State v. Bland, 958 S.W.2d 651, 660 (Tenn. 1997)). "[P]remeditation may be established by any evidence from which a rational trier of fact may infer that the killing was

done 'after the exercise of reflection and judgment' as required by Tennessee Code Annotated section 39-13-202(d)." State v. Davidson, 121 S.W.3d 600, 615 (Tenn. 2003). A jury may infer premeditation from circumstantial evidence surrounding the crime, including the manner and circumstances of the killing. See State v. Pike, 978 S.W.2d 904, 914 (Tenn. 1998); State v. Addison, 973 S.W.2d 260, 265 (Tenn. Crim. App. 1997). There are several factors which our courts have concluded may be evidence of premeditation: "the use of a deadly weapon upon an unarmed victim; the particular cruelty of the killing; declarations by the defendant of an intent to kill; evidence of procurement of a weapon; preparations before the killing for concealment of the crime; and calmness immediately after the killing." Bland, 958 S.W.2d at 660. Additional factors from which a jury may infer premeditation include the defendant's failure to render aid to the victim, see State v. Lewis, 36 S.W.3d 88, 96 (Tenn. Crim. App. 2000), and evidence establishing a motive for the killing. See State v. Nesbit, 978 S.W.2d 872, 898 (Tenn. 1998).

The defendant cites a number of factors which he argues evidence a lack of premeditation on his part, including the testimony of witnesses that the victim was armed and acting in a threatening and provocative manner, the fact that he shot the victim only once and made no attempts to flee or hide afterwards, and his own testimony that he never intended to kill the victim and shot him only because he believed he was pulling a pistol on him. There are other factors, however, from which the jury could reasonably infer that the defendant premeditated the killing. First among these is the fact that the defendant left the scene of the controversy, walked the 100 plus yards to his home to retrieve his shotgun, checked to see that the shotgun was loaded, gathered extra ammunition to put in his pocket, and walked back to the site, where he confronted the victim. The fact that the defendant may have been motivated by his anger toward the victim does not mean that he was incapable of forming premeditation during the walk to his home, retrieval of the weapon and ammunition, and walk back to the victim. We conclude, therefore, that the evidence is sufficient to sustain the defendant's conviction for first degree premeditated murder.

### III. Failure to Instruct on Voluntary Intoxication

As his last issue, the defendant contends that the trial court erred by not instructing the jury on voluntary intoxication. He argues that the testimony of TBI Special Agent Sweeney about his level of intoxication was sufficient to show that he was "highly intoxicated," which entitled him to a jury instruction on voluntary intoxication, even without a special request. The State argues, among other things, that the trial court did not err in not issuing the instruction on voluntary intoxication because the evidence did not show that the defendant "was so intoxicated as to prevent him forming the requisite mental state to commit first degree murder." We agree with the State.

"It is well-settled in Tennessee that a defendant has a right to a correct and complete charge of the law so that each issue of fact raised by the evidence will be submitted to the jury on proper instructions." State v. Farner, 66 S.W.3d 188, 204 (Tenn. 2001) (citing State v. Garrison, 40 S.W.3d 426, 432 (Tenn. 2000); State v. Teel, 793 S.W.2d 236, 249 (Tenn. 1990)). Accordingly, trial courts have the duty to give "a complete charge of the law applicable to the facts of the case." State v. Davenport, 973 S.W.2d 283, 287 (Tenn. Crim. App. 1998) (citing State v. Harbison, 704 S.W.2d 314, 319 (Tenn. 1986)). A trial court's denial of a request for special jury instructions is error only when the trial court's charge does not fully and fairly state the applicable law. State v. Cozart, 54 S.W.3d 242, 245 (Tenn. 2001).

In Tennessee, intoxication is not a defense to prosecution for an offense but "is admissible in evidence, if it is relevant to negate a culpable mental state." Tenn. Code Ann. § 39-11-503(a). "[W]hen a defendant is charged with an offense that requires a culpable mental state, such as first degree murder, 'a jury instruction about a defendant's alleged voluntary intoxication at the time he or she committed the offense under consideration is required only if the intoxication was such that it compromised the defendant's capacity for whatever culpable mental state the offense required.'" State v. Henretta, 325 S.W.3d 112, 130 (Tenn. 2010) (quoting State v. Hatcher, 310 S.W.3d 788, 815 n.16 (Tenn. 2010)).

The defendant's request for a special jury instruction on voluntary intoxication is not in the record. However, from the trial transcript, it appears that defense counsel made the request for the instruction in a proceeding that was held outside the courtroom, and that the trial court denied it "because of the speculative nature of the testimony." We find no error in this ruling. The TBI scientist testified only that the defendant's blood alcohol level at the time of the shooting *could* have been as high as .12 to .17%, and not that it was. More importantly, there was no testimony by any of the witnesses that the defendant was stumbling, incoherent, or otherwise appeared intoxicated. The defendant himself testified that he only had a few beers, and he described having walked to his house, retrieved his gun and ammunition, and walked back to the victim's trailer. The evidence at trial was not, thus, such to show that the defendant was so impaired as to be unable to form the requisite mental state for first degree murder. We conclude, therefore, that the defendant is not entitled to relief on the basis of this issue.

## CONCLUSION

Based on the foregoing authorities and reasoning, we affirm the judgment of the trial court.

_____
ALAN E. GLENN, JUDGE